```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
   RADAMES DEJESUS GONZALEZ,                                :    **MEMORANDUM DECISION**
                                                            :    **AND ORDER**
                                       Plaintiff,           :
                                                            :    16-CV-4612 (BMC)
              - against -                                   :
                                                            :
   COMMISSIONER OF SOCIAL SECURITY,                         :
                                                            :
                                       Defendant.           :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

    1.      Plaintiff seeks judicial review of the determination of the Commissioner of Social Security, following a hearing before an Administrative Law Judge ("ALJ"), finding that he was not disabled for purposes of qualifying for supplemental security income benefits despite his severe impairments of major depression, post-traumatic stress disorder, degenerative disc disease, and history of chronic obstructive pulmonary disease. Although plaintiff alleges that the ALJ's decision was not supported by substantial evidence, I have little doubt that on the record as it stands, there is substantial evidence to support the ALJ's decision. However, plaintiff also contends that the ALJ committed four errors that distort the record, and that these errors overshadow the picture of plaintiff's condition that might otherwise exist.

    2.      Plaintiff is correct that the ALJ's decision contains several observations and findings that are contradicted by the record, which the Commissioner has acknowledged in this proceeding. The issue is whether, singly or collectively, those mistakes were material to the decision such that a remand is necessary. See Cillari v. Colvin, No. 13CV4154, 2015 WL 1433371, at *21 (S.D.N.Y. March 30, 2015) ("Any error made by the ALJ . . . was . . .

immaterial and provides no basis for reversal or remand."); Gonzalez v. Colvin, No. 14-CV-6206, 2015 WL 1514972 at * 19 (S.D. N.Y. April 1, 2015) ("Any shortcoming in the ALJ's explanation is harmless error that does not require remand."); Zubizarreta v. Astrue, No. 08 CV 2723, 2010 WL 2539684, at * (E.D.N.Y. June 16, 2010) (declining to remand even though the ALJ failed to properly apply the treating physician rule because it would be "futile" as correct application of the rule would lead to the same conclusion); see also Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) (where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration).

3. Plaintiff's points of error are: (1) the ALJ misperceived the relationship between plaintiff and two of his treating physicians, and, for that reason, misapplied the treating physician rule; (2) the ALJ did not fulfill his duty to complete the medical record, as the records that he had from one treating physician suggested that there were more records, and the ALJ discounted the treating physician's opinion because of the lack of records; (3) the ALJ erred in finding that plaintiff can communicate in English; and (4) there were technical defects in the testimony of the vocational expert.

4. The last of plaintiff's points of error is disposed of easily. Plaintiff's objection to the vocational expert is twofold: (a) the ALJ did not "qualify" the vocational expert, i.e., show him to have the expertise to give vocational testimony; and (2) the ALJ did not give plaintiff's attorney the opportunity to object to the vocational expert giving testimony. It is true that the ALJ did not demonstrate that the vocational expert, referred to in the transcript of the hearing only as "Mr. Vaughn," had any qualifications at all. The record, which usually contains a resume of the vocational expert, does not even indicate the vocational expert's first name except

in the ALJ's decision, let alone any information on his expertise. It would have been better practice to have completed the record.

5. However, plaintiff was represented by the same law firm who has appeared for him in this review proceeding. The lawyer from that firm cross-examined the vocational expert and did not object to his testimony. The fact that counsel had – and used – the opportunity to cross-examine directly disposes of plaintiff's claim that he had no opportunity to object to the expert – an opportunity to cross-examine necessarily includes an opportunity to object to the testimony.

6. It also disposes, albeit less directly, of the claim that the absence of testimony on qualifications was a material error. This is not a *pro se* case. If counsel didn't ask about qualifications, it must be inferred that he knew the expert and was satisfied with his qualifications. In effect, counsel is asking the Court to excuse what could only be, if it were material, his own ineptitude. But the point is purely technical, and insufficient to require remand even in combination with other errors in the record that might.

7. The other points of error also arise from mistakes or alleged mistakes by the ALJ. First, one of plaintiff's psychiatrists, Dr. Dalia Olivier, filled out a medical source statement in May, 2014 (the "Olivier MSS") as to plaintiff's mental condition – a checklist of symptoms – which, if viewed in isolation, would seem to weigh heavily in support of a finding of disability. The ALJ gave Dr. Olivier's opinion "little weight" because the records

> show that Dr. Olivier only treated the claimant for only two months from May through July, 2012. Thus, Dr. Olivier had not treated the claimant in nearly two years at the time he [sic] rendered his [sic] opinions . . . and did not possess a longitudinal understanding of claimant's history and symptoms.

That was at least partially wrong. In fact, the record contains treatment notes showing that Dr. Olivier treated plaintiff twice more, in September and December 2012. So the longitudinal relationship was not as short as the ALJ thought – it was eight months, not three months.

8. In addition, Dr. Olivier's treatment overlapped to a large extent with treatment that plaintiff received from her colleague, a psychologist named Dr. Juan Rodriguez – both of them were at Lutheran Family Health Center ("Lutheran Family"). In fact, as the ALJ alluded to, plaintiff had also been evaluated by Lutheran Family social workers on two occasions in the end of April and the beginning of May 2012. Lutheran Family issued two treatment plans on Dr. Rodriguez's letterhead that were signed by Dr. Olivier. (Plaintiff considers these to be treatment notes, but they are not.) According to the Olivier MSS, the arrangement was for Dr. Olivier to see plaintiff monthly and Dr. Rodriguez to see him every two weeks. Although the treatment notes do not quite reflect that schedule, Dr. Olivier saw plaintiff, starting in May 2012, on five of the sixteen sessions that plaintiff had between the two of them. This means that Dr. Rodriguez and Dr. Olivier conducted the sessions on about a two-to-one ratio, respectively.

9. For these reasons, it can only be fair to conclude that Dr. Olivier, the psychiatrist, and Dr. Rodriguez, the psychologist, were jointly treating plaintiff on his emotional issues. I therefore think the ALJ was incorrect, not only as to the dates that plaintiff was receiving therapy at Lutheran Family from Dr. Olivier, but also in isolating Dr. Olivier's treatment without recognizing that this treatment was part and parcel of Dr. Rodriguez's treatment.

10. The question is, again, whether the ALJ's misconception was material. I agree with the Commissioner that it was not. First, the two treatment notes of Dr. Olivier that the ALJ overlooked, from September and December of 2012, show plaintiff's condition as less impaired than just about any of her prior treatment notes. Although Dr. Olivier noted his mood as

4

"depressed" on September 12 – after all, there is no dispute that plaintiff is suffering from depression – she also noted that his attitude was "cooperative, well-related"; his speech was "clear, normal"; his thought process was "intact, logical, goal-oriented;" his thought content was "unremarkable;" his insight and judgment were "fair;" and he had no perceptual disorders or suicidal ideation. Dr. Olivier further noted that her assessment of plaintiff was "improved." All of her prior treatment notes are similar but assessed him as either "stable" or "unimproved." She also noted on September 12 that plaintiff "reports feeling well, no new issues. Patient calm, relates well, mental status is unremarkable."

11. Her other overlooked treatment note from December 26, 2012, assessing plaintiff, without explanation, as "relapsing," was otherwise the same as her September 2012 treatment note. The December 26th note also stated that plaintiff was "feeling better, less anxious. Mood has improved. Patient calm, relates well, mental status unremarkable."

12. Even if the ALJ had viewed Dr. Rodriguez and Dr. Olivier as a single treating physician, this would not have assisted plaintiff because Dr. Rodriguez was more positive throughout his treatment of plaintiff. Of Dr. Rodriguez's eleven treatment notes, seven assessed plaintiff's mood as "euthymic," and all but one of the remaining notes were from the beginning of the treatment period. Having reviewed all of Dr. Olivier and Dr. Rodriguez's treatment notes, I do not see how an ALJ could rely on them to support a finding of disability.

13. For this reason, although the ALJ discounted the Olivier MSS for the wrong reason, he was clearly right to discount it. Many if not most of the findings in it are not only unsupported by the record, but are flatly contradicted by it. For example, Dr. Olivier noted that plaintiff had suicidal ideation, but every treatment note, including Dr. Rodriguez's treatment notes, states "no" next to that field. Dr. Olivier's primary diagnoses on the MSS from the DSM-

5

IV was 296.34, which is a "severe" major depressive disorder "with psychotic features," and 309.81, which is "Posttraumatic Stress Disorder," but every primary diagnosis in her and Dr. Rodriguez's treatment notes was 296.32, which is "moderate" major depressive disorder without any psychotic features.  In addition, although every treatment note has multiple diagnoses, none mentions PTSD.  In fact, despite the "psychotic features" diagnosis on the Olivier MSS, there is absolutely nothing in the treatment notes that suggests anything near psychosis or a psychotic episode.

14. Similarly, the Olivier MSS listed "poor memory" as one of plaintiff's symptoms, but every treatment note that addressed plaintiff's memory stated "memory intact."  In the same vein, Dr. Olivier said the highest Global Assessment of Functioning ("GAF") score plaintiff had was 50, which would mean "serious symptoms, (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," Access Behavioral Health, "Global Assessment of Functioning," at https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited March 18, 2017), but there is nothing in the treatment notes or diagnoses mentioning a GAF score at all, nor any notes that would reflect anywhere near that level of impairment.

15. I do not know why Dr. Olivier's MSS deviates so significantly from her and Dr. Rodriguez's treatment notes, especially since no mental health provider from Lutheran Family had seen plaintiff for eighteen months when Dr. Olivier completed the MSS.  It is clear that in completing the MSS, Dr. Olivier set out to make plaintiff seem more impaired than she had ever evaluated him to be.  But I am not about to remand the case so that another ALJ can reach the same inevitable conclusion that this ALJ reached – that there is no support for Dr. Olivier's

opinions as expressed in the MSS – just so that the proper ground for discounting it can be stated. That would be a waste of everyone's time.

16. Before leaving the topic of Dr. Olivier and Dr. Rodriguez, I would also note that Dr. Rodriguez's opinion, which was expressed in a short note to plaintiff's employer on June 24, 2013, suffers from the same infirmities, and the ALJ properly discounted it. Dr. Rodriguez's opinion, on which plaintiff heavily relies, varies less from the treatment notes than the Olivier MSS, and is even accurate in some observations, but its main purpose was to express Dr. Rodriguez's opinion that plaintiff could not handle his workload for at least six months. I think the ALJ properly discounted his opinion, not only because nothing in the treatment notes suggested that plaintiff could not work, but also because, as the ALJ noted, the determination of whether a claimant can work is reserved to the Commissioner. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

17. Plaintiff's third claim of factual error by the ALJ is very likely not an error at all. Plaintiff relies on a medical source statement completed by Dr. Marwa Mohammed Moussa, an internist at Lutheran Family, on April 29, 2013 (the "Moussa MSS"). This evaluation, once again, would weigh heavily in support a finding of disability – for example, Dr. Moussa opined that plaintiff could not sit for more than one hour or walk for more than two hours in an eight hour period. However, the ALJ gave the Moussa MSS "little weight" because Dr. Moussa "on the first page of her [sic] statement . . . stated that she [sic] had only begun treating the claimant 30 minutes earlier." The ALJ was referencing a field on the MSS that asked: "Name, frequency, and length of contact," where Dr. Moussa hand-wrote in, "30 minutes."

18. Plaintiff claims that the ALJ misconstrued Dr. Moussa's "30 minutes" notation, arguing that he must have been referring to how long it took him to fill out the MSS and

7

therefore Dr. Moussa should have received all of the deference normally afforded to a treating physician. Plaintiff bases this argument on two documents in the record: (a) a prescription form that Dr. Moussa signed on April 18, 2012, for an inhaler that plaintiff used for his asthma; and (b) three of Dr. Rodriguez's treatment notes towards the end of 2012, which contain a reference at the top to "PCP" (I assume that is "primary care physician," or "primary care provider"), followed by Dr. Moussa's name. Because of these documents, plaintiff criticizes the ALJ for failing to develop the record by not obtaining other records from Dr. Moussa, and for discounting the Moussa MSS because Dr. Moussa purportedly met plaintiff for only 30 minutes.

19. It is, again, ironic that the same law firm that represented plaintiff at the hearing is accusing the ALJ of failing to obtain records when counsel at the hearing never alerted the ALJ to any gaps in the record. Plaintiff relies on Perez v. Charter, 77 F.3d 41, 47 (2d Cir. 1996), for the rule that an ALJ must develop the record even if a claimant is represented by counsel. Although that oft-quoted dictum is accurate, I have not seen any case applying that rule to a situation where the alleged gap in the record is a theory of counsel in hindsight, rather than one that should have been reasonably apparent to the ALJ. An ALJ will generally be found to have breached his duty where there were obvious deficiencies in the record. If plaintiff's attorney wanted to come up with a creative theory on how there might be more documents, he needed to have done it before the ALJ, not in a review proceeding. Cf. Jordan v. Comm'r of Soc. Sec., 142 F. App'x 542, 543 (2d Cir. 2005) (summary order) (finding that the ALJ fulfilled his duty to develop the record where counsel volunteered to obtain documents from the plaintiff's treating physician; the ALJ kept the record open to allow counsel to submit the documents; counsel later advised that he had "nothing further to add"; and counsel did not request the ALJ to help him obtain the documents); Alachouzos v. Comm'r of Soc. Sec., No. 11 Civ. 1643, 2012 WL

601428, at *6 (E.D.N.Y. Feb. 23, 2012) (noting that although the fact that plaintiff was represented at the administrative hearing by counsel does not reduce the ALJ's duty to obtain records even if the attorney does not request them, "it is of more than passing interest that plaintiffs counsel not only did not identify any missing records when he was before the ALJ . . . or raise this point on his administrative appeal from that decision . . . . "). That is entirely reasonable considering that all a plaintiff's attorney needs to do to validate his theory is get his client's history to determine if there should be more records.

20. Both sides, and the ALJ, seem to have failed to recognize that the most accurate way to understand how to view plaintiff's care from a treating physician perspective is to look at his relationship with Lutheran Family in its totality and how that institution provided care to him. He saw many doctors, social workers, and other professionals at Lutheran Family, and it was where he would go if he had any ailment – some of which are immaterial to this proceeding – that he felt needed to be treated. In a practical sense, it was Lutheran Family that was providing his care rather than any one physician.

21. Thus, there are a number of doctors whose prescription forms appear in the record, not just the one from Dr. Moussa. There are also prescriptions from Dr. Levin, Dr. Ali El Atat, and Dr. Ahmad. Almost all of Dr. Olivier and Dr. Rodriguez's notes, except the three that plaintiff highlights, list plaintiff's "PCP" as "Community PCP," not Dr. Moussa. Additionally, when plaintiff needed a lesion removed from his nose in May of 2012, his PCP was listed as Dr. Naggar, an internist. Other forms show his "Attending Physician" as Dr. Nawaiz Ahmad, a plastic surgeon and orthopedist. Further, when plaintiff was treated for the flu as late as September as 2014, a condition that might be worrisome for someone with COPD and asthma, it was not Dr. Moussa who treated him, but Dr. El Atat.

9

22. Because of the way Lutheran Family provided plaintiff with care (and I am not criticizing that in any way), there is no mystery as to why Dr. Moussa would have written a prescription, appeared as PCP on three of the sixteen mental health treatment notes, or filled out an MSS. When plaintiff needed a new inhaler, it could have just as easily been Dr. Naggar or Dr. El Atat who wrote the prescription. Similarly, while Dr. Rodriguez listed Dr. Moussa as the PCP on three of his eleven treatment notes, for whatever reason, he could have just as easily listed either of the other internists. The fact is that plaintiff's COPD/asthma was under good control – the ALJ was being indulgent when he found it to be a "severe" impairment – so he usually did not need an internist.

23. When the Commissioner asked for a medical MSS from Lutheran General, somebody had to fill it out, and that happened to be Dr. Moussa. There wasn't very much to report. We know this because the ALJ made requests for documents from Lutheran Family on at least three occasions, and it produced voluminous records. The presence of one prescription from Dr. Moussa, and cross-references by Dr. Rodriguez to Dr. Moussa on three occasions, is insufficient to trigger on obligation of the ALJ to hunt for more.

24. Finally, plaintiff asserts that the ALJ improperly found that he could communicate in English. Plaintiff is correct. Indeed, the ALJ even noted at the hearing that plaintiff could not communicate in English. The error is so blatant that I am almost inclined to believe that when the ALJ wrote, "claimant has a limited education and is able to communicate in English," he inadvertently dropped the word "not." This possibility is supported by the fact that in framing the hypothetical to the vocational expert, the ALJ included the assumption that the individual could not speak English. In any event, as the Commissioner points out, the error is not material

for precisely this reason – with the vocational expert having assumed an inability to communicate in English, the ALJ's analysis would not have changed.

25. In sum, this was far from a perfect decision based on a careful review of the record. Nevertheless, the errors that the ALJ made are immaterial because the conclusion is sound and based on the record.

26. Plaintiff's motion for judgment on the pleadings is denied, and the Commissioner's motion is granted. The Clerk shall enter judgment accordingly, dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
March 19, 2017